May it please the Court. My name is Greg Kroc, the law firm of Buchanan, Ingersoll & Rooney. I represent the appellants, the Port Authority Of Allegheny County, and the former Director of Sales for the Port Authority, Anthony J. Hickton. If I may, I'd like to reserve three minutes for rebuttal. Go ahead. The Supreme Court of the United States has defined viewpoint discrimination as denying access solely to suppress a particular point of view on a subject matter that is otherwise includable in the form. For this reason, any trial court that has to address a viewpoint discrimination claim has to address three particular issues. Number one, what is the subject matter of the proposed speech? Number two, is that subject matter otherwise includable in the form? Is that a subject matter that the government permits in the form? And number three is motive. Number three is motive, and it is if. If the subject matter is one that is otherwise includable, why was the speech at issue rejected? Mr. Clark, let me go to what is number one for us, though, as a court of appeals. And that's the standard of review. And I'm interested in hearing your response because I was intrigued by the issue introduced into this appeal by the appellees. And it appears in a footnote, but it implicates the standard of review, I think, profoundly. And that is the suggestion by the appellees that the Bose case from the Supreme Court does not require that we apply symmetrically the kind of probing sort of review, particularly of factual determinations here, that I assume you would urge is our standard of review. We have a split in the circuits on this. We also have at least a suggestion, and I'd like to hear from both sides about that from this court, that perhaps symmetrical application is the appropriate course. But we start with standard of review, obviously. And in this case, we have numerous factual determinations by the district court, very important factual determinations made, as your own hierarchy of issues suggests, especially ultimately with respect to motive or some kind of reason on the part of the authority. It's not the authority for its decision-making other than what it purported to be the real reason. So I want to hear from you on why it is we should apply the Bose standard of review to the factual determinations in this case. I will answer, Your Honor, in two kind of separate portions. First of all, there is a split of authority. There certainly is that there's some reference out there that a more exacting standard of review, a clear error, should apply only to the findings of fact. I don't think there's any dispute that for constitutional facts or mixed questions of law and fact that a plenary standard applies. The reason, Your Honor, why it should apply, there should be a plenary review, regardless of whether... Bose came out of a clash which the court purported to resolve between Rule 52 and this more exacting standard. What I'm interested in hearing about are the reasons of legal and constitutional policy for why we ought to make an across-the-border symmetrical application of that standard in a case where, as here, the speaker, the party whose First Amendment rights were supposedly determined by the district court to have been violated, should be subjected to the exacting standard. The reason, Your Honor, is because of the importance, not just to the speaker, but to the government entity, in this case the Port Authority, because the decision... The government is alleged to be the suppressor of speech, not the speaker, not the party to whom First Amendment protections are accorded. In this particular case, Your Honor, that's true, but the ramifications of this case are going to be significant, not just for this speaker, but for a lot of speakers, because the reality is the reason that the Port Authority is given so much discretion in the analysis of reasonableness in deciding to open the forum for certain subject matters or certain speakers, yet still keep it closed for other speakers or for other issues, particularly when the government is acting as a proprietor, like the Port Authority is. The reason it's so important, Your Honor, is because the Port Authority has to be given that discretion. It has to be reviewed carefully, because the Port Authority's choice in this matter may be to shut down the forum. The Port Authority derives less than one-half of one percent from its advertising revenue. Now, that's a million to a million and a half dollars a year. It's important for a cash-strapped Port Authority. But with a budget of $350 million, approximately 40 percent of which comes from ridership, Port Authority cannot allow certain types of speech on its vehicles. And the reason that it is given such latitude in the reasonableness approach, and the reason why viewpoint discrimination is defined so narrowly on the subject matter, is because the Port Authority could get placed into a reasonable alternative, which is to shut the forum down so that other speakers will not be allowed to have any speech on Port Authority vehicles. And for that reason, it is imperative that the Court examine under the standard review of plenary, or de novo, all facts at issue in this case, and that there shouldn't be a lesser standard simply because the Port Authority is the appellant in this case. So the Seventh and Ninth Circuit would disagree with you, I guess, right? The Seventh Circuit, I believe, would disagree with us. I know that there are other courts that have expressly stated, and I think the Supreme Court may have at one point in time, that the reason that such broad discretion is given in both in the reasonableness assessment and in viewpoint discrimination is precisely because we want to encourage government entities to meet the maximum extent that they feel comfortable. That's valuable from a First Amendment standpoint. Well, which specific factual findings do you contest that would be affirmed under a clearly erroneous standard of review, but you say we should reject under a de novo review? Well, I think there are certain that are mixed issues, Your Honor, but I don't believe that any of our issues actually are a pure factual determination. Maybe one. I think whether or not the political component, whether the Port Authority is really used post hoc rationalization on whether it considered the political nature of the advertisement, that I think is truly a factual decision that the court made that was a credibility decision that I think would be a different standard of review. But the primary areas that we've raised, number one, that the subject matter was just improperly defined, number two, that there was not an otherwise includable subject matter, and number three, that the court ignored the Supreme Court law about distinctions that are appropriate. Those are all purely legal issues. I know there are obviously issues here that you want to get to, and I don't want to restrain you or detain you too long, but does it make sense for this court to have two tracts of review that it employs to determine whether or not the Supreme Court review determinations of fact? That is, unless we determine that we have resolved already in one of our previous cases whether or not more exacting review as opposed to mere clear error review applies to factual determinations. Aren't we, in the meantime, until that question is resolved, required then to look both ways at factual determinations made by the district court to see if they pass muster? I think that's certainly something that the court is entitled to do, but I don't think that that decision needs to be made in this case. Well, has it already been made in child evangelism fellowship? If you're familiar with it. Yeah, I'm familiar with the case. I'm not sure that it necessarily ruled on, you know, whether, especially when confronted with what now appears to be a conflict of case law, I'm not sure that that is kind of a binding decision that has been made. But again, in this case where the trial court found that the subject matter of rights education, we certainly are happy to discuss why that is excessively broad and why it's not appropriate, but even assuming it were, the trial court ruled on summary judgment that that was not an otherwise includable subject matter. The court authority never, ever intended to accept noncommercial public service announcements that were intended to educate people about their rights. Never intended to. And that's what the trial court found on summary judgment. The trial court acknowledged, you know what, there might have been a couple cases that the port authority thought these advertisements were commercial. I'm not going to rule on summary judgment whether it's commercial or not. But I will rule on summary judgment that port authorities thought it was commercial. That was why port authority admitted the ads. Well, that ruling, the ruling on summary judgment that port authority never intended to allow rights education ads, or any education ads, that precludes a finding of viewpoint discrimination. Unless the port authority was a co-sponsor of the ads, right? There were some... Correct, because at that point in time that is not commercial, it's not noncommercial, it's a separate form of speech known as government speech that is immune from this type of forum analysis. But the result we got in this case, based on the judge's summary judgment ruling that was kind of overlapping with the trial ruling, is that the port authority mistakenly accepted a few ads that dealt with rights that it thought were commercial. By making that mistake, those mistakes are now being used as evidence of viewpoint discrimination. And now the port authority is in a position where it can't reject noncommercial public service announcements in the future, because if it does... prohibits those ads, and the trial court found it tried to follow it. It did its best to follow it. But when you get 500 ads a year, or more, we are looking over a three year time period of over 1,500 ads. Courts have recognized, especially in the vanity plate cases, mistakes are going to be made, and those mistakes cannot be compounded on the guise of viewpoint discrimination. The trial court, I know your time is up, but I just have one more question. The trial court had indicated that whatever ad is run should parallel or be similar to the one the Women's Law Center ran. Were there any efforts to come up with language in an ad? Yes, Your Honor, there were. Because when we ultimately found out that it wasn't just the coalition of concerned citizens that wanted to run this ad, but they were willing to almost convert it into a service related ad to promote the ACLU's legal services, we said, look, if that's similar to the Women's Law Project, we'll do it. But here's the key. You cannot try to backdoor in the public service announcement. The Women's Law Project says, just because you're young doesn't mean you don't have rights. Call the Women's Law Project for confidential legal services. We agreed that it doesn't mention a right. No voting, no abortion, no women's rights. We agreed that we would run an ad that said, you know, just because you're an ex-felon doesn't mean you don't have rights. Call us for confidential legal services and put the ACLU's number to make it identical to the very ad. And we were told repeatedly, including by counsel, that that is not acceptable. This is a voting ad. And it is important that this ad mention the right to vote. So, Your Honor, you've hit the nail on the head. It's impossible for us to comply with that order if the court does not reverse because we don't know what to do. We've been ordered to do two things. Run an ex-offender ad that models the Women's Law Project, but at the same time mention ex-offender rights. Those are inherently inconsistent. It can't model the Women's Law Project if it mentions the right. The Women's Law Project just wanted to promote their services. They never asked to make a public service. We'll have you back in rebuttal. Thank you. Mr. Kuczynski. May it please the court. My name is John Kuczynski and together with co-counsel Sarah Rose, I represent the Pittsburgh League of Young Voters Education Fund and the American Civil Liberties Foundation. I'd like to begin my presentation with a comment on Judge Vanaski's last question, and that is whether or not the Port Authority can run an ad that is modeled on the Women's Law Project ad. We specifically asked the Port Authority witnesses at page 1636 to 1640 of the record and at pages 1658 to 1660 of the record. The Women's Law Project ran an ad that said just because you're young doesn't mean you don't have rights. And I asked how about an ad that says just because you've been to jail doesn't mean you can't vote. And the Port Authority witnesses maintained that our ad would be commercial because it would include a line that said if your rights are violated, call us for assistance, just as the Women's Law Project ad had a line. And yet the Port Authority said even though such an ad would be as commercial as the ad it accepted from the Women's Law Project, it would not run the ad that we were promulgating. Well, their argument is it's more specific in the second instance. It deals just with voting as opposed to all rights. And what difference does that make? The Women's Law Project ad, because it's young women, includes the right to vote. It includes potentially the right to abortion. It includes any right. But I would also refer the court then to the Fair Housing Partnership ad which says housing discrimination is illegal. The argument made by counsel for the Port Authority here that it does not accept right-specific ads is disingenuous. There is an ad from the Fair Housing Partnership that says housing discrimination is legal. And then it lists the basis of the illegal the grounds for illegal housing discrimination, race, religion, et cetera. And it says for help call. It doesn't say what type of help. It doesn't say any service would be provided. The record is so clear on this. And if I could get to Judge Smith's main question is why is it that the BOE standard doesn't apply here, I would suggest that the court look at the basis and the reasoning behind the adoption of the BOE standard. Actually my question was precisely the opposite. Why should it apply? Why should it be symmetrical here? It shouldn't. And the reason is that the whole raison d'etre for the BOE standard was so that the courts gave greater deference to the First Amendment and really looked to see if the government was denying First Amendment rights should it engage in a more exacting scrutiny. That raison d'etre doesn't apply to situations here where the court has found in favor of the First Amendment. What about our 2008 opinion in ACLU versus Mukasey where we did apply BOE's on review where the speaker had won before the district court. Now granted there is no discussion as to whether or not BOE's is the appropriate standard to apply on a symmetrical basis, but we cite it, we give at least lip service and go on apparently to employ it as our standard of review. What you've given me the answer in stating your question is it was probably not raised as an issue and the court then saw that it has the BOE standard and I think that's also used in the child evangelism case where it was not raised as an issue. However, in the Christ's Bride case, this court held that it will defer to the credibility determinations of the district court when there are rulings in favor of the First Amendment. The main thing is here, however, is that we prevail regardless of what standard is employed. While I would urge as we argued in the standard of review section of our brief that you apply the clearly erroneous standard to the findings of fact, even the more exacting scrutiny would result in a decision supporting and affirming Judge McVeary's decision and the facts that he found were based only after considering five full days of testimony in a bench trial and consideration of the post-trial submissions of the various counsel. Why isn't the Port Authority's rejection of the League of Women Voters ad, the Get Out the Vote type ad, dispositive here? Because that's just one example and the courts have held that in one or two instances of rejecting ads, but many instances of accepting other ads, that does not prove the government's case. Here we have a plethora of non-commercial ads in which the Port Authority has, without any hesitation, accepted them and ran those ads and it's because their witnesses testified that they viewed the voting rights of ex-offenders to be controversial and, quote, a hot-button political issue that they rejected the ad that we advanced. Those are code words for viewpoint discrimination. Those prove their basis for rejecting the ad. Controversy, divisiveness, hot-button political issues, those are the words that prove malintent. Those are the words that prove viewpoint discrimination. I don't understand how the Port Authority can maintain that it can accept an ad that says housing discrimination is illegal. Just because you're young doesn't mean you don't have rights. And those ads acknowledge under cross-examination have political dimensions to them. The witnesses recognize that housing discrimination results in all sorts of controversy and political discussion at the local level in terms of things such as group homes, zoning disputes. It recognized that the rights of young women generates and involves political issues. Also, there was testimony that the Just Harvest ad, which provided free tax preparation services for low income workers, involved political issues. So what they are saying here, especially when the term political is not defined by the policy, we have seen that the Port Authority and Judge McVery found that the definition that their witness gave, even though it's not incorporated into the policy, that the ad that we sought to run does not meet the Port Authority's definition of political. Anthony Hickin, one of the defendants, testified that political in terms of the way he implemented the policy meant that it had to be a candidate ad or it had to be a ballot referendum ad. The ad that we sought to run was nonpartisan, nonpolitical, it dealt with no candidates, dealt with no party, and promulgated no issue. It was not an advocacy ad. It was an ad that sought to educate the public of certain rights of which there was a lot of confusion and to provide legal services and assistance to those whose rights were violated. Therefore, that the ad that we maintained, these were all noncommercial ads, and I understand the Port Authority maintains because at the tail end, if the Women's Law Project or the Fair Housing Partnership provide legal services, there may in some instances be an award of attorney's fees that can be collected. That also applies to the ad that we sought to run. We also developed evidence, and should the court conduct the more exacting scrutiny, the court would find evidence that the Port Authority was aware that the ACLU was one of the sponsors of the ad, and the Port Authority was aware that the ACLU engaged in civil rights litigation. But did they know the ACLU was perhaps wanting to add that as part of the case? There were many efforts at which there were attempts made to resolve this issue, some in fact with Judge McVeary, and we consistently offered to work with the Port Authority, just as it had done with the Women's Law Project, to include what language it would like to have in such an ad. The Port Authority categorically refused to accept any reasonable suggestion or to make offers of its own other than drop the reason for your ad, eliminate the word ex-offenders have the right to vote. Well, you know, I thought that was interesting. There was some interesting language in that respect in the opinion. Is there really a fact that, assuming the Port Authority didn't do as much with your group as opposed to another group, is that really evidential of any type of viewpoint discrimination? It is once the suggestion was made that they offered that same benefit to us. And like I said, we sat down and met So your position is it's circumstantial evidence? It's not circumstantial, it's there. Well, it's not direct evidence, is it? Well, it's direct evidence that they offered it to one party and refused to offer it to us. Yes, but as to pretext, you have to draw an inference. I'm actually trying to make your point. That is evidence of pretext, just as there was other evidence of pretext, and Judge McVeary made specific findings of fact after considering five full days of testimony in this case. I would like to turn for a moment to our cross appeal and the issue of reasonableness, because that is the area in which we believe that Judge McVeary erred as a matter of law. And Judge McVeary determined that the proposed ad was not reasonable on the basis of what a reasonable person could find. At the summary judgment stage, summary judgment can only be entered if a party is entitled to judgment as a matter of law. Once the judge said a reasonable person could make a certain conclusion, it admits to the opposite, that a reasonable person might also reach an opposing conclusion. That then created a question of fact, and it became error for the court to grant summary judgment on the reasonableness question. I don't follow that, I'm sorry, because the question, as I understood it at least, is whether there is a reasonable basis for the rejection of the ad. If there is a reasonable, if a person could draw that, if a person could find that to be a reasonable basis for rejecting the ad, why doesn't that end the inquiry? Because it also, it admits the fact that a reasonable person may find that isn't a good ground for rejecting the ad. So you've got to have a fact question for the jury. It's like a determination of whether a provision in the contract is ambiguous. If a reasonable person could draw it, it's ambiguous. And then it has to go to the jury. Right, but the question of law that the judge has just decided doesn't go to the jury. That is, is the provision ambiguous? That's correct, but here we're dealing with a specific determination of what was reasonable without the court saying a reasonable person must find that it was a political ad. And the proof that it was is that there has to be evidence proving the nexus between the government reason for the restriction and the rejection of the proposed ad. Here the Port Authority said they don't want to run this ad because without any evidence in the record whatsoever, they view it as controversial and hot button. There's no evidence of that in the record. And they believe that that would create problems with its ridership. And the record is silent as to that. And the cases are clear that where there is only speculation that the acceptance of an ad might cause divisiveness, that is not sufficient because otherwise the government could say anything could cause a problem. There has to be some record evidence. I would point the court out to the Third Circuit case in San Martino where the issue was whether someone wearing motorcycle club clothing could go into certain government buildings. And the basis for that was, the asserted basis was, that might cause problems. And this court held that in the absence of evidence that there had ever been a problem regarding the clothes that people wore, such a restriction was unreasonable. It also goes to the viewpoint issue in terms of how broadly or how narrowly we define subject because the Third Circuit didn't say we're going to look at define the subject as clothes that contained some representation of motor vehicles. The court looked at, defined the subject as all clothing that identified an organization. So we look at that the courts have struggled to define subject broadly because the more narrowly you define the subject, the easier it is for government to keep out the groups and the messages that it finds disfavorable. Similarly in the case of child founded, I'm sorry, it's the case involving the vanity license plates, the Child's First Foundation. Children's First Foundation. This court held that you don't define the subject as abortion vanity license plates so that you have to allow opposing views. The definition of the subject matter there was advocacy license plates. So the courts have always in this circuit and in a number of others defined the subject of which there is a viewpoint of broadly. We're over time, but we thank you very much. Thank you, Your Honor. Three quick points that I'd like to make to the panel. First of all, as far as findings of potential concerns and problems with allowing political or noncommercial speech, there was evidence of that in the record. It was undisputed that prior to March of 1998, Port Authority's old advertising policy allowed noncommercial speech. Port Authority changed the policy because it had received so many complaints about its advertisements and through counsel, it modified the policy to limit it to noncommercial ads that information was provided to the Fair Housing Partnership and the commission in conjunction with their ad. Number two, I think it's important to address the issue of controversial. There seems to be some assumption that because Port Authority, one of the people talked about hot button issues or controversial issues, that means there's viewpoint discrimination. It doesn't. It is a valid reason. The Supreme Court of the United States has repeatedly held the desire to avoid controversy is a valid reason to exclude a subject matter, not a viewpoint. You can't allow controversial or noncontroversial ads on one viewpoint but exclude others. Judge VanAskey, the League of Women Voters ad is perfectly at issue because that shows that's a noncontroversial voting ad. It's clear that the Port Authority, when they talked about controversy, they weren't talking about controversy as the basis for excluding this ad. Mr. Hess was being asked about the reasons for excluding all political ads under the policy. All of them. So there is no evidence whatsoever that controversy was used for this ad and this ad only. It was used to exclude all ads that were noncommercial or that are political. And that's very important for the distinction between the service issues. What I heard Mr. Pershinski say is look, there's no reason to distinguish an ad that talks about why X felon should be able to vote and an ad about providing tax services or providing services for people who may have been discriminated against housing. There's a fundamental difference between those. In the city of Lehman versus Shaker Heights, which is still binding United States Supreme Court law, the court was asked to review a policy that said one thing, no political ads. The Supreme Court said, you know what, political ads, A, political is not defined, but that wasn't an issue. Political ads and those type of ads, they include not just candidate ads but issue ads like say voting rights or abortion. They said that is very different than service related ads. Even service related ads that are noncommercial. In Shaker Heights the policy was to accept noncommercial ads by civic entities, religious entities, charitable entities that were offering free services. And the Supreme Court of the United States said it's okay to distinguish free service ads from issue ads because they're less innocuous and they're less likely to cause controversy. Well in this case, when Port Authority rejected the X felon ad, it did not know that the ACLU wanted to change the ad and change the public service announcement to include services. It didn't know. And that is a fundamental reason to distinguish those cases. In summary judgment, the Supreme Court, or this court. Thank you. Thank you counsel. The matter was very ably argued. We'll take it under advisement.